**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **MICHAEL LEONARD,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **No. 17 C 9259** |
| | ) | |
| **DENIS McDONOUGH,**[1] **AS SECRETARY,** | ) | **Judge Rebecca R. Pallmeyer** |
| **U.S. DEPARTMENT OF VETERANS** | ) | |
| **AFFAIRS AND U.S. DEPARTMENT OF** | ) | |
| **VETERAN AFFAIRS,** | ) | |
| | ) | |
| **Defendants.** | ) | |

**MEMORANDUM OPINION AND ORDER**

Plaintiff Michael Leonard worked for the U.S. Department of Veterans Affairs ("VA" or "the Agency") for more than 25 years, most recently as a Criminal Investigator for the Edward J. Hines VA Medical Center ("Hines") in Hines, Illinois. On March 8, 2013, the VA fired Plaintiff after sustaining charges against him for lack of candor, failure to properly perform the duties of his position, failure to follow established police procedures, and poor judgment as a police officer. Plaintiff appealed his removal to the Merit Systems Protection Board ("MSPB"), but the MSPB ultimately upheld the removal decision after sustaining some but not all of the charges against him. Plaintiff now petitions this court to review the MSPB's final decision affirming his removal [58]. Additionally, Plaintiff's Complaint [1] brings claims against Defendant Denis McDonough, as Secretary of the U.S. Department of Veterans Affairs, alleging that his firing was the result of race-based discrimination and retaliation in violation of Title VII.

---

[1] When Plaintiff filed this lawsuit, David J. Shulkin was the Secretary of the U.S. Department of Veterans Affairs. On February 8, 2021, the Senate confirmed Denis McDonough as the VA Secretary and he currently heads the Department of Veterans Affairs. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, McDonough is substituted as Defendant.

Defendant has moved for summary judgment on all claims. As explained below, Defendant's motion for summary judgment [54] is denied in part and granted in part and Plaintiff's petition for review [58] is denied.[2]

## FACTUAL BACKGROUND[3]

Plaintiff Michael Leonard, a Black male, worked as a law enforcement officer at Hines from 1987 until his termination in March of 2013. (L.R. 56.1 Statement of Undisputed Material Facts in Supp. of Def.'s Mot. for Summ. J. ("DSOF") [56] ¶¶ 4, 74; Pl.'s L.R. 56.1(B)(3) Additional Statements of Fact ("PSOF") [65][4] at 34 ¶ 1.) He began his career at Hines as a patrol officer, and by 2009 had worked his way up to the position of a Criminal Investigator with the rank of Captain. (*Id.* at 34 ¶ 1.) As a Criminal Investigator, Plaintiff's primary responsibilities included "planning and conducting investigations and maintain[ing] a safe and secure environment" on Hines property. (DSOF ¶ 5; PSOF at 2 ¶ 5.) Plaintiff reported directly to the Assistant Chief of Police at Hines, who was one rung below the Chief of Police in the supervisory chain. (DSOF ¶ 6.)

## I.     Leonard's EEO Complaint

The relevant events of this action began on December 5, 2011, when Plaintiff Leonard was involved in a heated verbal exchange with Lieutenant Cary Kolbe, a white law enforcement

---

[2]     This motion has been briefed for some time but was only recently reassigned to this court. (*See* Executive Committee Order [89].)

[3]     Despite the frequent appearance of the term "disputed" in the parties' factual submissions, they present substantially consistent narratives regarding the incidents central to Plaintiff's claims. While the parties nominally contest almost every fact, the court's examination of the record indicates that many of these disputes lack genuineness or material significance. The ensuing factual summary relies on information supported by admissible evidence in the record. In cases where a fact is genuinely contested, the court explicitly acknowledges the dispute.

[4]     Plaintiff filed his additional L.R. 56.1 statements in the same document as his responses to Defendant's statement of facts, creating some clumsiness in how the court cites to Plaintiff's additional statements versus his responses. To avoid confusion, the court will include both the relevant page number(s) and paragraph number(s).

officer at Hines. (PSOF at 35 ¶ 3.) Leonard testified at his deposition that the argument revolved around which specific charges to bring against someone they had just arrested. Leonard believed in one set of charges, while Kolbe argued for a different set. (Leonard Dep. [56][5] at 61:12–62:5.) As tensions escalated, Leonard and Kolbe confronted each other face to face, prompting Leonard to yell at Kolbe, "Boy, you better get out of my face." (*Id.* at 62:21.) Another Hines officer intervened before the dispute could escalate further. (*Id.* at 63:1–2.) While separated, Kolbe was heard by other officers saying, "I'll kill that old man." (*Id.* at 63:2–3; PSOF at 35 ¶ 3.) Leonard himself did not hear Kolbe make this comment but heard about it later from other officers. (Leonard Dep. at 63:2–3.)

The incident was reported (the parties do not say by whom) to the then-Chief of Police at Hines, Donald Gardiner. On February 16, 2012, Gardiner issued to Plaintiff Leonard a written admonishment for "disrespectful conduct" towards another police officer, while on February 23 he proposed a three-day suspension for Kolbe. (*Id.*) Upset about the disciplinary action, on March 14, 2012, Leonard contacted the VA's Office of Resolution Management ("ORM") to initiate a complaint of race and age discrimination against Chief Gardiner. (*Id.* at 36 ¶ 4.) However, Gardiner resigned (the parties do not say why) before issuing a final disciplinary decision against Kolbe and before the Agency resolved Leonard's complaint.

Steven Thurman, a white male, replaced Gardiner as Chief of Police at Hines in May 2012. (DSOF ¶ 7; PSOF at 36 ¶ 5.) Prior to taking that position, Thurman was the Chief of Police at the Jesse Brown VA Medical Center in Chicago ("Jesse Brown"). (PSOF at 36 ¶ 5.) Thurman had a reputation for being generally hostile towards the EEO process and suspicious of employees who filed EEO complaints. For example, the Assistant Chief of Police at Hines in 2012, James Runge, claimed that upon Thurman's arrival at Hines, Thurman asked him to compile a list of current

---

[5] The exhibit containing Plaintiff Leonard's deposition transcript is located within DSOF [56] at 518–567.

officers who had previously filed EEO complaints.  (PSOF at 36 ¶ 6.)  Runge complied and emailed Thurman the names of seven employees who had previously filed EEO complaints; the list did not include Leonard.[6]  (*Id.*)  Runge also claimed that Thurman had stated at staff meetings that he would fight EEO complaints "tooth-and-nail" and would not settle these claims.  (*Id.*)  Indeed, Thurman himself testified at a deposition hearing that "the majority" of employees who were recommended for termination at Hines had previously filed EEO complaints.  He speculated that this was because, prior to his arrival, Hines "[had] been an ATM" where EEO filers "[were] able to settle [their claims] with prior leadership."  (Thurman Dep. on Aug. 28, 2013 [65-1][7] at 116:13–117:1.)

As the Chief of Police, Thurman inherited Lieutenant Kolbe's disciplinary matter and decided to reduce his predecessor's proposed three-day suspension to an admonishment, aligning it with the punishment Plaintiff Leonard had received for his part in the altercation.  (PSOF at 37 ¶ 8.)  Thurman's arrival also coincided with Leonard's pending EEO action.  (*Id.* at 37 ¶ 7.)  Leonard elected to participate in the VA's alternative dispute resolution program, which was a mediation program, in lieu of immediately filing a formal EEO complaint.  (*Id.*)  Lelar Taylor, from Hines' EEO office, and Jennifer Gutowski, the Associate Director of Hines at the time, facilitated the mediation.  (*Id.*)  Thurman directed Assistant Chief Runge to attend the mediation as a representative of the police department.  (*Id.*)  During the mediation, Leonard proposed that Lieutenant Kolbe undergo the VA's threat assessment program and receive anger management training, a suggestion Runge conveyed to Chief Thurman.  (*Id.*)  Thurman disagreed with that proposal and instructed Runge to withdraw from the mediation effort.  (*Id.*)  The record does not

---

[6]     The parties have not identified the date that Runge emailed this list to Thurman, nor do they explain why Leonard's name does not appear on the list.  Perhaps this was because although Leonard initiated the process in March 2012, he did not formally file his EEO complaint until July 5, 2012.

[7]     The exhibit containing Thurman's August 28,2013 deposition transcript is located within PSOF [65-1] at 135–175.

specify the date(s) on which Leonard's mediation commenced but the mediation failed, and on July 5, 2012, Leonard filed his formal EEO complaint. (*Id.*) Because the filing deadline was July 3, the VA dismissed that complaint as untimely. (*See* PSOF at 191–193.)

## II.     Complaints and Investigations Involving Leonard

On June 3, 2012, Joan Ricard became the Director of Hines. (DSOF ¶ 10.) Shortly after her arrival, Ricard received two separate complaints concerning Leonard. The first complaint was filed in July 2012 by Hines police officer Edward Dobrowolski. (DSOF ¶ 15.) In this complaint, Officer Dobrowolski alleged that Leonard had interfered with an arrest on July 2, 2012 and that Leonard had a practice of improperly meddling in investigations, including tipping off suspects of investigations, especially when he had a personal connection to a suspect. (*Id.*)

Ricard then received a second complaint related to Plaintiff on September 7, 2012. (*Id.* ¶ 16.) This complaint was forwarded to Ricard via email by Dr. Nina Graves, who was the Division Chief of the Law Enforcement Oversight and Criminal Investigations Division in the Office of Security and Law Enforcement at the VA. (*Id.*) The complaint had been anonymously filed with the VA's Office of Inspector General ("OIG") Hotline on July 14, 2012 and alleged that for the past seven years Leonard (and other Hines employees) had fraudulently logged overtime hours for days/times they did not actually work. (*Id.*) A portion of the anonymous email complaint read:

> Capt. Leonard states he is working over time [sic] on days he is not at work, or leaves and conducts personal business on VA Time. This has been going on for the last 7 years. Capt. Leonard never puts in his time off, he just takes off and gets paid. Then waits until the end of the year saying he has time that he has to use or lose. In addition he states he works weekends and late at night, he doesn't even show up on weekends, and on the days he does show up he says he has worked more hours than actually worked . . . A report was run in vista[8] for the last three months and everday [sic]. . . Capt. Leonard had overtime that was not correct. Some of the days Leonard was not even at work. How do you obtain OT while not at work? This information is able to be verified by vista, weapons turn in sheet, and many in the department would come forward if asked.

(*Id.* at 30–31.)

---

[8]     Neither party clarifies what "vista" refers to, but the court assumes it is a reference to a computer program used by the VA to track employee time and attendance.

Around the same time that these two complaints were filed, the VA opened three separate investigations of Leonard. The first investigation began on July 23, 2012, when Chief Thurman directed Officer Terrence Burczyk and Joe Fogarty from the Jesse Brown VA to investigate the allegations of time theft made about Plaintiff in the anonymous OIG complaint. (*Id.* ¶¶ 19–20.) The second investigation began sometime in September of 2012 and related to allegations made in the Dobrowolski and OIG complaints.[9] (*Id.* ¶ 26.) This investigation was led by Jeffrey Garrett, the Chief of Police of the Atlanta VA Medical Center, and Don Foster, a Detective-Lieutenant at the Atlanta VA. (*Id.*) Precisely who decided to open the second investigation is at least nominally disputed. Ricard claims that she herself did so. (*Id.* ¶ 18.) Plaintiff contends this is disputed (PSOF at 8 ¶ 18), but the evidence he cites does not directly contradict Ricard: Plaintiff points out that Thurman stated that during "the first week [he] was [at Hines]" (that is, in the month before Ricard came to Hines), he met with the Associate Director and the Acting Director and asked that they "look into the backgrounds" of various officers who had complaints levied against them regarding their "suitability" to be a police officer. (Thurman Dep. on Aug. 28, 2013, at 111:21–112:18.) Plaintiff also notes Ricard's testimony that ordinarily it is the "responsibility of the chief" to "take action" on reports of misconduct by officers. (Ricard Dep. on Dec. 18, 2014 [65-1][10] at 100:17–24.) It was Chief Thurman who, on September 16, 2012, directed that a third investigation be conducted, into whether Leonard had tampered with evidence during an investigation of stolen goods. (DSOF ¶ 32.) Thurman directed that Lieutenant Kolbe (the officer with whom Leonard had previously had an altercation) lead this investigation. (*Id.*)

In general, the findings of the investigations supported the allegations made in Officer Dobrowolski's complaint and in the OIG complaint. For instance, the Burczyk and Fogarty

---

[9]     In addition to investigating allegations against Leonard, Garrett and Foster were also tasked with investigating allegations against various other officers at Hines. (*See* PSOF at 12–13 ¶ 28.)

[10]     The exhibit containing Ricard's December 18, 2014 deposition transcript is located within PSOF [65-1] at 38–72.)

investigation uncovered evidence that between August 2010 and July 2012, there were numerous days when Leonard claimed to have been working but had not logged in to the VA Police System ("VAPS") or accessed his work computer. (*Id.* ¶ 20.) There were also several occasions where Leonard failed to check out his VA-issued firearm or, if he did check it out, returned it before the end of his shift. (*Id.*) The investigation also found that many of these days coincided with days that Leonard claimed to have worked overtime or weekend hours. (*Id.*) Based on the findings of this investigation, on October 30, 2012 Chief Thurman issued a Letter of Inquiry to Leonard requesting that he explain the work he completed these days and why he did not check out his weapon on these days. (*Id.* ¶ 24.) Leonard responded on November 6, 2012, providing a description of work he performed on some, but not all, of days in question. (*Id.* ¶ 25.) His response also noted that he likely did not check out his gun on these various days because he was doing work in his office that did not require his firearm and also noted that he would occasionally turn in his firearm early if he was "down by the station (making copies or talking with the supervisor on duty)" and wanted to "take advantage of th[e] opportunity of someone being available instead of calling someone in off the road to turn-in [his weapon]." (DSOF at 126.) It is unclear from the record whether Chief Thurman replied to Leonard's response letter.

Then, Garrett and Foster's investigation, dated October 3, 2012, unearthed evidence that in the past Leonard had "potentially alter[ed] the facts of an investigation to alter the potential outcomes." (*Id.*) This conclusion was based on an interview with Hines' Assistant Canteen Chief Shannon Hughes, who reported three theft cases in which she believed Leonard had acted inappropriately by altering the dollar amounts involved so as not to (in Leonard's words) "ruin someone's life." (*Id.*) Additionally, their investigation found that on July 2, 2012, Leonard reported to a felony crime scene unarmed (in violation of VA Directives) and that he also "acted unprofessionally" (in otherwise undescribed ways) during the arrest. (*Id.* ¶ 28.) Garrett and Foster concluded their report by proclaiming that "Leonard is a liability to all investigations due to the reported manipulation of facts in certain cases." (*Id.* ¶ 29.) It does not appear from the record

that Leonard had an opportunity to dispute the allegations Garrett and Foster made in their report at that time; however, Leonard does now deny that he acted unprofessionally at the July 2 felony crime scene (though he does not deny that he was unarmed) and denies that he ever manipulated the facts of an investigation.  (PSOF at 13 ¶ 28.)

The third investigation, led by Kolbe, found support for one of the concerns raised in the Garrett and Foster report involving Assistant Canteen Chief Shannon Hughes, which alleged that Leonard had altered the value of stolen goods during an investigation.  (DSOF ¶¶ 32, 36, 37.)  The record is unclear as to when this investigation concluded and whether Leonard was provided with an opportunity to dispute its findings, but Leonard claims here that the allegations made against him in Kolbe's report are false and underscores Kolbe's bias against him because of their previous altercation.  (PSOF at 16–17 ¶¶ 36, 37.)

## III. Leonard's Removal

On January 10, 2013, Chief Thurman issued Leonard a Notice of Proposed Removal.  (PSOF at 40 ¶ 15.)  The proposed removal levied four charges against him: Lack of Candor ("Charge A"); Failure to Properly Perform the Duties of Your Position ("Charge B"); Failure to Follow Established Police Procedures ("Charge C"); and Poor Judgment as a Police Officer (Charge D").  (DSOF ¶ 42.)  Each charge in the notice listed one or more "specifications" that provided the basis for the charge.  Charge A contained one specification that stated:

> Specification: Investigation revealed that on multiple days you worked overtime, you did not log into a VA Police Service computer or otherwise log into the VA Police Service program ("VAPS").  These days included December 17, 24, and 31, 2011.  In response to the Letter of Inquiry asking about those dates, you stated you "[r]eviewed over 25 Report of Survey's[11], numerous equipment items per survey, equipment history's, made corrections."  Using the computer and VAPS systems would be necessary for you to review and/or make corrections to Reports of Survey.

(*Id.* ¶ 43.)  Charge B contained four specifications that stated:

---

[11]    A Report of Survey ("ROS") is a formal missing items report used by the VA.  (*See* DSOF ¶ 55.)

Specification 1: Investigation revealed that between approximately October 20, 2011 and January 14, 2012, you failed to follow up on some altered receipts provided to you with respect to an investigation of theft in the Hines Canteen Service. This resulted in a lowering of the amount that could be shown to have been stolen. This conduct is contrary to the trust that should be associated with the position of Criminal Investigator and does not promote the efficiency of the service.

Specification 2: Investigation revealed that on multiple days you worked overtime, you did not log into a VA Police Service computer or otherwise log into VAPS. When questioned about what work you did, you stated that on December 17, 24, and 31, 2011, you "[r]eviewed over 25 Report of Survey's, numerous equipment items per survey, equipment history's, made corrections." Using the computer and VAPS systems would be necessary for you to do this.

Specification 3: You worked overtime on seven days in January 2012. When asked to explain what work you accomplished on those days, you failed to respond as to January 12 and January 28, 2012, and failed to show you performed any duties on those days.

Specification 4: Your position description states you are "responsible for conducting thorough investigations to develop leads based on tips and other information in connected [sic] with suspected violations of Federal and/or State Laws and VA Regulations." In October 2012, Acting Hines VA Hospital Police Service Chief Steve Thurman discussed his concerns with you regarding your lack of independent investigation with respect to Reports of Survey. He instructed you that you must conduct proper investigations, including interviews with relevant witnesses. Nevertheless, you continued to conduct investigations of missing VA property without any independent investigation.

(*Id.* ¶ 44.) Charge C was supported by the following materials:

Background: Hines Policy Memorandum 578-05-007-021 (R-3) states, "[e]ach VA Police Officer will be in possession of his/her assigned service pistol at all times while on duty on department property." Hines VA Police Firearms, Chapter IV, Section F; VA Directive 0702; VA Handbook 7020; VA Directive 0730; and VA Handbook 7030 also set out requirements for procedures with regard to officers being armed while on duty.

Specification 1: In connection with Charge A, Specification 1, it was brought to the attention of Police Management that on multiple days you worked overtime, but you did not draw[12] your weapon or, if you drew your weapon, you did not have it in your possession for the full period you worked.

---

[12] When the Agency states that Leonard did not "draw his weapon," the court understands this to mean that he did not check out his VA-issued handgun; it does not refer to the colloquial use of the phrase where one draws his or her handgun from its holster and points at a target.

[Specification 1 then lists fifty-one dates from October 2010 through July 2012 where Leonard did not draw his weapon or did not have it in his possession for the full period worked.]

Adhering to Police Service policies is of utmost importance to ensure the safety of patients, employees, and others.

Specification 2: July 2, 2012, you responded to a felony arrest scene. You were not armed, which put those at the scene in the surrounding area at risk.

Specification 3: November 16, 2012, Chief Thurman instructed you that you must be armed at all times while on duty. However, November 21, 2012 and December 13, 2012, you were not armed for all hours you were on duty.

Specification 4: Results of the Fact-Finding indicate that you did not follow proper police procedures when investigating an incident of an Environmental Management Service employee who allegedly stole cologne from the Hines Canteen Service. Assistant Chief of the Hines Canteen Service, Shannon Hughes, asked to have the video recording of the incident preserved so the evidence would be available for prosecution. If the video was not preserved, it would auto-delete after 30 days. A police officer told Ms. Hughes he had to turn the matter over to you and the investigation team. Ms. Hughes waited three days, then contacted Police Service again to request an update on the status of the investigation. At this point, you discussed the incident with Ms. Hughes, who stressed she did not want to lose the evidence from the security camera. However, no one recorded the evidence, which was lost after 30 days passed. This resulted in an inability to pursue the case against the suspect.

(*Id.* ¶ 45.) Finally, Charge D was supported with two specifications:

Specification 1: July 2, 2012, you responded to a felony arrest scene. You were not armed, which put those at the scene and in the surrounding area at risk.

Specification 2: In connection with Charge B, Specification 1, you failed to follow up on some of the altered receipts provided to you. You told Ms. Hughes something to the effect of you did not want to ruin the suspect's life.

(*Id.* ¶ 46.)

The removal notice provided Leonard with a copy of the evidence file that served as the basis for each of the charges. (*Id.* ¶ 50.) The evidence file included the reports prepared by Officers Burczyk and Fogarty, Officers Garrett and Foster, and Officer Kolbe. (*Id.*) Additionally, the file contained several primary sources including employee timecards, witness statements, login data related to Leonard's use of the VA computer system, and logs detailing when Leonard checked-in/out his firearm. (*Id.* ¶ 51.)

On January 24, 2013, Plaintiff Leonard, through counsel, provided a written response to the Notice of Proposed Removal. (*Id.* ¶ 58.) Leonard's response letter was addressed to Director Ricard—who was the Hines official responsible for deciding whether to sustain the charges against Leonard. (*Id.* ¶ 59.) His letter was twenty-nine pages long and provided both legal and factual arguments against each of the eleven charges levied against him. (PSOF at 40–41 ¶ 17.) Three overarching contentions that Leonard raised in his response are worth highlighting here. First, Leonard claimed that he did not need to log in to a VA computer or the VAPS system to do his work. (*See* Certified Administrative Record ("R.") [18] 000194–96.) He explained that he would often review hard copies of Reports of Survey instead of reviewing them on his computer. (*Id.*) He also explained that he performed other work aside from reviewing Reports of Survey, such as conducting "spot checks" of areas where there were concerns of theft or other crimes, which did not require him to use a computer. (*Id.* 000196.) Second, Leonard reiterated that the administrative duties involved in his role as a Criminal Investigator meant that he often did not need to have his firearm to do his job, in particular when he was doing paperwork. (*Id.* 000206.) In other words, Leonard argued that the VA's firearms guideline did not strictly apply to him as a Criminal Investigator and, moreover, that evidence that he did not check out his weapon on a given day was not evidence that he was not working on that day. Third, Leonard denied the allegations that he ever tampered with or manipulated a VA investigation into stolen goods. (*Id.* 000197–200.)

On March 4, 2013, Ricard notified Plaintiff Leonard by letter of her decision to sustain all the charges levied against him and to remove him from employment effective March 8, 2013.[13] (DSOF ¶ 74.) Ricard's letter stated that she had conducted an independent review of the

---

[13]    While Leonard was notified of the decision to remove him on March 4, 2013, and was removed on March 8, 2013, the record shows that the Agency did not send him a "final decision letter" until January 21, 2014. (*See* R. 0007.) The parties do not explain why it took roughly eight months for Leonard to receive the final decision letter.

11

evidence file and concluded that, in light of the evidence, Leonard's responses to the notice of proposed removal were not credible and that each charge was supported by a preponderance of the evidence.  (*Id.* ¶¶ 60, 62.)  Further, in a declaration prepared for this litigation, Ricard states that "although I reviewed the limited volume of material [in the evidence file] provided by Thurman and Kolbe, that material in no way influenced my decision to remove Leonard from employment." (Ricard Decl. [56][14] ¶ 38.)  Though she may not have considered the "limited volume" of material that Thurman furnished, Ricard's removal letter does state that one factor she considered was Chief Thurman's recommendation that Leonard be fired.  (DSOF at 513.)

## PROCEDURAL HISTORY

Under the Civil Service Reform Act ("CSRA"), 5 U.S.C. § 1101 *et seq.*, a federal employee may appeal "particularly serious" employment actions, such as removal from employment, to the MSPB.  *Perry v. Merit Sys. Prot. Bd.*, 582 U.S. 420, 423 (2017) (citing 5 U.S.C. §§ 1204, 7512, 7701).  The MSPB is "an independent adjudicator of federal employment disputes."  *Kloeckner v. Solis*, 568 U.S. 41, 44 (2012).  An appeal to the MSPB must be filed within 30 days of the effective date of the action or within 30 days after the date of receipt of the agency's decision, whichever is later.[15]  A federal employee's appeal to the MSPB may be limited to a civil-service claim—that is, a claim that the "agency had insufficient cause for taking the action under the CSRA."  *Perry*, 582 U.S. at 423–24.  Alternatively, the appeal to the MSPB may "also complain of adverse action taken, in whole or in part, because of discrimination prohibited by another federal statute, for example, Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*"  *Id.* at 424.  These latter appeals—which contain allegations of both an employment action serious enough to appeal to the MSPB as well as federally proscribed discrimination—are referred to as "mixed cases."  *Id.*

---

[14]     The Declaration of Joan Ricard is located within DSOF [56] at 18–25.)

[15]     *See* Appellant Questions and Answers, U.S. MERIT SYSTEMS PROTECTION BOARD, https://www.mspb.gov/appeals/appellantqanda.htm#:~:text=An%20appeal%20must%20be%20filed,agency%27s%20decision%2C%20whichever%20is%20later (last visited February 23, 2024).

Plaintiff Leonard appealed his removal to the MSPB on February 17, 2014, challenging the accuracy of the Charges and Specifications and asserting that his removal was motivated by his race and prior protected activity. (R. 0007.) The MSPB referred his appeal to an Administrative Judge ("AJ"), pursuant to 5 U.S.C. § 7701(b)(1), and the AJ conducted hearings over three days in July of 2015. (*Id.* 001411.) Prior to the hearings, the Agency withdrew Charge B, Specification 3 (alleging overtime fraud on seven days in January 2012), and the AJ struck Charge D as duplicative of Charge B Specification 1 (alleging that Leonard did not conduct a proper investigation in a theft case) and Charge C, Specification 2 (alleging that Leonard responded to a felony crime scene unarmed). (*Id.* 1419, 1426 n.8.)

On February 25, 2016, the AJ affirmed the Agency's decision to remove Leonard, but only on the basis of four of the eleven charges initially levied—Charge B, Specification 4 and Charge C, Specifications 1–3. (*Id.* 001419–28.) Charge B, Specification 4 was a charge brought by Chief Thurman that claimed Leonard had a practice of not conducting complete investigative reports of stolen property and would instead "cut and paste" template language from other reports to expedite the process. (*Id.* 001420.) Charge C, Specifications 1–3 all concerned various instances where Leonard did not comply with the VA's policy that police officers be in possession of their assigned firearm at all times while on duty. (*Id.* 001422–28.)

The AJ did not sustain Charge A; Charge B, Specifications 1 and 2; or Charge C, Specification 4. (*Id.* 001411–38.) In rejecting Charge A and Charge B, Specification 2—both of which involved allegations that Leonard claimed to be working on days when he did not log in to a VA computer or VAPS—the AJ found that Leonard's claim that "he could do [his] work without logging in to a computer or a computer system [was] supported by the testimony" of multiple witnesses, including Director Ricard, who testified herself that she often does work without accessing VAPS or any computer system. (*Id.* 001413–14, 001419.) The AJ rejected Charge B, Specification 1—which concerned the Kolbe investigation that found Leonard had manipulated the amount of money stolen in an investigation of theft—because she found that Kolbe's report

came "to the cursory conclusion that [Leonard] mishandled the investigation, not because the numbers don't add up, but instead based on his opinion that [Leonard] wanted to assist [the suspect] and had a conflict of interest." (*Id.* 001417.) The AJ also found that Kolbe's report should be rejected because it was "an incomplete and preliminary draft and not a final investigation." (*Id.*) Finally, Charge C, Specification 4—which alleged that Leonard failed to preserve video evidence of a theft, resulting in the Agency's being unable to prosecute the suspected offender— was rejected by the AJ because the VA failed to prove "that the loss of the video resulted in its inability to prosecute the suspect." (*Id.* 001429.)

Notwithstanding the Agency's failure to prove all the charges that it brought against Leonard, the AJ found a sufficient nexus between the sustained charges and the efficiency of the VA police service to support the penalty of removal from employment. (*Id.* 001432–33.) Additionally, the AJ noted that she gave deference to Ricard's testimony that she would have removed Leonard even absent the charges that were not sustained. (*Id.* 001433.) The AJ also rejected Leonard's affirmative defense of retaliation, finding that Leonard failed to provide any evidence supporting that claim. (*Id.* 001429–31.)

Leonard filed a Petition for Review ("PFR") with the MSPB. The Board granted that petition and then, on January 3, 2017 vacated the AJ's decision in part. (*Id.* 2032–33.) Specifically, the MSPB affirmed the AJ's findings related to Charge C, Specifications 1-3, but vacated and remanded the findings concerning Charge B, Specification 4 and remanding the case for "credibility findings" on that charge. (*See id.* 002034–38, 002048–49.) Also, because "the agency failed to prove or withdrew many of the specifications in support of the sustained charges," the MSPB vacated the penalty analysis conducted by the AJ and ordered that, on remand, the AJ allow the parties to submit supplemental evidence and argument regarding the appropriate penalty. (*Id.* 002041–43.) Lastly, the MSPB also vacated and remanded the AJ's findings related to Leonard's affirmative defense of retaliation, directing the AJ to "assess all relevant evidence

and make new findings as to whether [Leonard] proved that his removal was a result of retaliation." (*Id.* 002044–49.)

On remand, the AJ again affirmed Leonard's removal.  (*See Id.* 003986-4015.)  In this ruling, made on November 6, 2027, the AJ made additional credibility findings to support her conclusion that Leonard failed to properly conduct independent investigations, as alleged against him in Charge B, Specification 4.  (*Id.* 003987-97.)  The AJ also reaffirmed her earlier holding that removal was a reasonable penalty under the circumstances; she rejected Leonard's disparate penalty argument because Leonard's proffered comparators did not engage in the same misconduct that he did.  (*Id.* 004002–07.)  As for Leonard's affirmative defense of retaliation, this time the AJ found that retaliation for prior EEO activity was a motivating factor in Leonard's removal because Chief Thurman, who played a key role in the removal, "had an animus against participation in the EEO process."  (*Id.* 003999, 004000.)  The AJ concluded, however, that Leonard was not entitled to relief from the termination decision on this basis; the Agency "would have removed [Leonard] absent any discriminatory or retaliatory motive," because "the sustained misconduct far outweighs any discriminatory motive."  (*Id.*)

On December 23, 2017, pursuant to 5 U.S.C. § 7703(b)(2), Plaintiff Leonard filed the present action in his court, alleging that the MSPB erred in affirming his removal and that his removal was the result of race discrimination and retaliation in violation of Title VII.[16]  (*See* Compl. of Discrimination and Retaliation and for Rev. of a Final Decision of the Merit Systems Protection Board ("Compl.") [1].)

---

[16]    When a federal employee believes an MSPB's final ruling is erroneous, the employee may seek judicial review of that decision.  *See* 5 U.S.C. § 7702(a)(2).  If the petitioner seeks judicial review of an MSPB's final decision involving only civil service claims, he must file his case in the Court of Appeals for the Federal Circuit.  5 U.S.C. § 7703(b)(1).  However, when a federal employee seeks review of an MSPB decision concerning a "mixed case," as Plaintiff Leonard does here, the employee "should seek judicial review in district court, not in the Federal Circuit."  *Kloeckner*, 568 U.S. at 56; *see also Miller v. Saul*, 803 F. App'x 963, 966 (7th Cir. 2020) (reviewing a ruling from the district court and observing, "[w]e have jurisdiction . . . over 'mixed cases' that also include claims of discrimination.").

**LEGAL STANDARDS**

As mentioned above, Plaintiff's case is a "mixed case" because his appeal to the MSPB contained both civil-service and Title VII claims. District courts reviewing mixed cases are tasked with applying differing standards of review to each of the petitioner's claims. A court's review of an MSPB decision is deferential, and the MSPB's decision must be affirmed unless it is "(1) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; (2) obtained without procedures required by law, rule, or regulation having been followed; or (3) unsupported by substantial evidence." 5 U.S.C. § 7703(c); *see also Delgado v. Merit Sys. Prot. Bd.*, 880 F.3d 913, 916 (7th Cir. 2018). On the other hand, district courts conduct a de novo review of a petitioner's claims of discrimination in violation of federal law. *Perry*, 582 U.S. at 429 (citing 5 U.S.C. § 7703(c)). Thus, summary judgment on Plaintiff's Title VII claims is appropriate only if the movant (here, Defendant) shows that there is no genuine issue of material fact and he is entitled to judgment as a matter of law. FED. R. CIV. P. 56(a). A genuine dispute exists, and summary judgment is precluded, if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The moving party bears the burden of showing the absence of genuine issues of material fact. *LaRiviere v. Bd. of Trs. of S. Ill. Univ.*, 926 F.3d 356, 359 (7th Cir. 2019). If that burden is met, the non-moving party must come forward with sufficient evidence showing that there is a genuine issue for trial. *Id.* At the summary judgment stage, a court views the record in the light most favorable to the non-moving party and draws all reasonable inferences in that party's favor. *Jaranowski v. Ind. Harbor Belt R.R. Co.*, 72 F.4th 744, 749 (7th Cir. 2023).

The court's review of Leonard's case is thus bifurcated. First, the court will review Defendant's motion for summary judgment on Plaintiff's Title VII claims de novo. Then, the court will review the MSPB's decision affirming Leonard's discharge from the VA under the more deferential arbitrary and capricious standard.

16

## DISCUSSION

### I.  Title VII Claims

Plaintiff raises two claims under Title VII, one alleging discrimination based on race and another alleging retaliation.  Defendant has moved for summary judgment on each of these claims.  While Plaintiff's theory of liability across these two claims is largely consistent, the court deals with each claim separately.

### A.  Retaliation

To establish liability under Title VII, Leonard must show that (1) he engaged in protected activity; (2) he suffered an adverse employment action; and (3) there is a causal link between the protected activity and the adverse action.  *Lewis v. Wilkie*, 909 F.3d 858, 866 (7th Cir. 2018); *see also Huff v. Buttigieg*, 42 F.4th 638, 645 (7th Cir. 2022), *reh'g denied*, No. 21-1257, 2022 WL 16640618 (7th Cir. Nov. 2, 2022).  The parties do not dispute that Plaintiff meets the first two requirements: he filed a formal EEO complaint in July 2012, and the VA fired him in March 2013.  Accordingly, only the causation requirement is at issue.

The Seventh Circuit has clarified that "private and federal employees face different causation standards under Title VII"; with private-sector employees needing to prove but-for causation, while federal-sector employees need only show that the retaliation "play[ed] a part in a federal employment decision."  *Huff*, 42 F.4th at 645 (citing *Babb v. Wilkie*, 140 S. Ct. 1168, 1175 (2020)); *see also Crain v. McDonough*, 63 F.4th 585, 593 (7th Cir. 2023).[17]  As a federal

---

[17]     Federal and private sector employees face different causation standards because their rights to sue arise under different provisions of Title VII.  The federal sector right arises under § 2000e-16(a) and states that "[a]ll personnel actions affecting employees . . . shall be made free from *any* discrimination based on race, color, religion, sex, or national origin."  42 U.S.C. § 2000e-16(a) (emphasis added).  The private sector right arises under § 2000e-3(a), which states that "[i]t shall be an unlawful employment practice for an employer to discriminate against any of his employees . . . *because* he has opposed any practice made an unlawful employment practice by this subchapter . . . ."  42 U.S.C. § 2000e-3(a) (emphasis added).  The Seventh Circuit has read the more prohibitive language of § 2000e-16(a) to impose a higher burden on the federal government, prohibiting unlawful discrimination from playing *any* part in its employment decisions.  *Huff*, 42 F.4th at 645–46.

employee, Plaintiff has the benefit of the more generous standard. In determining whether retaliation was a motivating factor in the VA's decision to remove Leonard, the court weighs the evidence as a whole, considering direct and circumstantial evidence together. *Ortiz v. Werner Enters., Inc.*, 834 F.3d 760, 766 (7th Cir. 2016). Common categories of circumstantial evidence include "suspicious timing, ambiguous statements, pretext, and evidence of similarly situated employees who were treated differently." *Huff*, 42 F.4th at 647 (citing *Coleman v. Donahoe*, 667 F.3d 835, 860 (7th Cir. 2012)).

Leonard's case adds a layer of complexity to the court's causation analysis because Leonard has no evidence that Ricard—whom he concedes made the final decision to fire him—had any retaliatory (or other) animus against him. (DSOF ¶ 11; *see also* Leonard Dep. 35:10–38:6.) Instead, Leonard points to Chief Thurman as the retaliatory actor and articulates his Title VII claims under a "cat's paw" theory of liability. (Pl.'s Resp. in Opp. to Def.'s Mot. for Summ. J. ("Pl.'s Resp. to Summ. J.") at 11–12.) That theory "applies when a biased supervisor who lacks decisionmaking power uses the formal decision maker as a dupe in a deliberate scheme to trigger a discriminatory employment action." *Vesey v. Envoy Air, Inc.*, 999 F.3d 456, 461 (7th Cir. 2021) (internal quotation marks and citation omitted). Under this theory, a plaintiff must show that the adverse employment action they suffered was "proximately caused" by the biased supervisor's actions. *See id.* at 462. Proximate cause exists if the investigation took the biased supervisor's complaint into account "without determining that the adverse action was, apart from the supervisor's recommendation, entirely justified" or if the investigation "relies on facts provided by the biased supervisor." *Id.* (internal quotation marks and citation omitted).

Thus, to avoid summary judgment, Leonard must identify evidence that would permit a reasonable juror to conclude that Thurman "proximately caused [Leonard's] termination by actions that were tainted by retaliatory motive." *Huff*, 42 F.4th at 647. In effect, Leonard has the task of "connect[ing] the dots" between several points in a bureaucratic process and showing that (1)

Thurman retaliated against him by proposing his removal and (2) Ricard's eventual decision to remove Leonard was proximately caused by Thurman's removal proposal. *Id.*

I

In support of his assertion that Chief Thurman harbored retaliatory animus against him, Plaintiff identified three categories of evidence: statements and conduct by Thurman; the suspicious timing of events surrounding Thurman's arrival and the investigations into Leonard's work history; and the VA's inconsistent statements regarding said investigations and the removal decision. The court details each of these arguments in turn.

The most compelling evidence of Thurman's animus lies in the Chief's own words and actions. Thurman openly confessed his frustration with the EEO process at staff meetings and warned employees that under his tenure as Chief he would fight EEO complaints "tooth and nail" and would resist settling them. (PSOF at 36 ¶ 6.) Even during his deposition testimony, Thurman expressed his disdain for EEO complainants, observing that most of the employees he recommended for removal had previously filed EEO complaints—suggesting a correlation between poor work performance and filing an EEO complaint. (*See* Thurman Dep. on Aug. 28, 2013 at 116:13–117:1.) Plaintiff also cites, as telling, Thurman's request that Assistant Chief Runge compile a list of officers who had previously filed discrimination complaints. Additionally, Plaintiff states that Thurman's role in his EEO mediation, specifically Thurman's denial of Leonard's proposed remedy and his direction that Runge withdraw from participating in Leonard's mediation further displays hostility. Finally, and relatedly, Leonard underscores the questionable decision by Thurman to have Lieutenant Kolbe, who had made a threat against Leonard, lead the third investigation of Leonard's conduct. (PSOF at 35 ¶ 3.) This evidence could reasonably support Leonard's overall theory that Thurman aimed to have him fired and took actions consistent with that goal.

Leonard urges, in addition, that the timing of events in his case was suspicious. He notes the six-month gap between his July 2012 EEO complaint and Thurman's proposal to remove him

Case: 1:17-cv-09259 Document #: 92 Filed: 03/06/24 Page 20 of 34 PageID #:6077


in January 2013. Plaintiff also emphasizes Thurman's close connection to each investigation into his work history, and that the first investigation began in July 2012—the same month Leonard filed his discrimination complaint. Although the Seventh Circuit has "rejected any bright-line rule about how close the events must be to establish causation," *Castro v. DeVry Univ., Inc.*, 786 F.3d 559, 565 (7th Cir. 2015), suspicious timing alone is "rarely" enough to survive summary judgment. *Igasaki v. Illinois Dep't of Fin. & Pro. Regul.*, 988 F.3d 948, 959 (citation omitted). This is especially so when there is a plausible, non-retaliatory explanation for the timing, as is the case here: the investigations into Leonard were prompted by complaints about his conduct that were filed in July and September. Accordingly, the timeline of events is not particularly compelling. A jury may, however, consider this evidence, along with the other evidence of retaliatory animus, when determining pretext. *Magyar v. Saint Joseph Reg'l Med. Ctr.*, 544 F.3d 766, 772 (7th Cir. 2008) ("Suspicious timing, together with other facts, can sometimes raise an inference of a causal connection."); *see also Huff*, 42 F.4th at 650 (finding five-month gap was not strong evidence of suspicious timing but nevertheless that jury may consider this alongside other evidence).

In a related argument, Plaintiff contends that Defendants have offered conflicting accounts about who authorized the investigations and what Director Ricard actually considered in making her removal decision. Ricard now claims that she directed Garrett and Foster to conduct the second investigation into Leonard without any input from Chief Thurman (DSOF ¶ 18), and the evidence cited by Plaintiff on this score does not directly refute this. Ricard makes a similar claim with respect to the ultimate decision to terminate Leonard; she states that Thurman "in no way influenced my decision to remove Leonard from employment" (Ricard Decl. ¶ 38); yet the removal letter she sent Leonard stated, "I have also considered other factors, including . . . [that] [t]he Acting Chief, Police Service, has also recommended that I remove you." (DSOF at 513) emphasis added). *See Huff*, 42 F.4th at 649–50 (finding that conflicting testimony regarding who initiated removal action and how termination decision were made was evidence of pretext).

In an attempt to dismiss Plaintiff's evidence, Defendant argues that Thurman could not have retaliated against Plaintiff because, according to Defendant, Thurman had no knowledge of Plaintiff's prior protected activity. Plaintiff filed his EEO complaint against Chief Gardiner prior to Thurman's arrival at Hines, and Defendant contends that there is "no evidence that [Leonard] provided Thurman with a copy of his complaint against Gardiner or ever discussed it with him." (Reply Br. in Supp. of Def.'s Mot. for Summ. J. [72] at 4–5.) True, there is no evidence that Leonard himself discussed the charge with Thurman, but Assistant Chief Runge (who was Leonard's immediate supervisor and reported directly to Chief Thurman) has declared that Thurman was unquestionably aware of the mediation process for Leonard's EEO complaint: he directed Runge to withdraw from that mediation. (PSOF at 37 ¶ 7.) Therefore, Defendant's argument in this regard holds no weight.

The evidence of Thurman's animus is substantial, and a reasonable juror could conclude that Thurman proposed Leonard's removal "at least partly because" he had previously filed an EEO complaint. *Huff*, 42 F.4th at 651. The court turns next to the question whether that proposal resulted in Leonard's termination.

## II

On this question, Leonard admits that only Ricard had the authority to remove him but argues that Thurman infected her decision-making enough to be causally responsible. Defendant urges that Ricard decided to remove Leonard only after conducting an independent review of the evidence, and particularly the findings of the three different investigations of Leonard's conduct, none of them led by Thurman. Given the volume of evidence against him, Defendant argues, Leonard has not shown that retaliation was the "but-for" cause of his removal. (Br. in Supp. of Def.'s Mot. for Summ. J. [57] at 15.) For some of the same reasons outlined above, and more explained below, the court finds that Plaintiff's cat's paw theory has merit.

21

As an initial matter, Defendant incorrectly states the causation standard Plaintiff must meet.  As a federal employee, Leonard only needs to show that retaliation "played a part" in the decision to remove him, not that it was the "but for" cause of his removal.  *Huff*, 42 F.4th at 645.

This generous standard is significant here.  As for whether Ricard truly conducted an independent review free from Thurman's taint, the record, especially when read in the light most favorable to Plaintiff, suggests otherwise.  Most notably, in the removal letter itself, she explicitly states that Thurman's recommendation played a part in her decision.  (DSOF at 513.)  Plaintiff also highlights that Thurman was the VA official in charge of drafting the removal proposal as well as curating the contents of the evidence file that accompanied it, which served as the basis for Ricard's decision.  (PSOF at 32 ¶ 70.)  The fact that Ricard accepted all of the eleven charges Thurman recommended in the removal proposal is troubling in that it suggests that she may have simply acted as a rubber stamp—particularly given that only four of the eleven charges were ultimately sustained by the AJ.  Significantly, of the four charges ultimately sustained, one of them—Charge B, Specification 1, which alleged that Leonard was not conducting thorough investigations of stolen goods and instead would "copy and paste" template language into his reports—was based not on any of the three allegedly independent investigations, but rather on an allegation that came directly from Thurman.  (*See* R. 001420.)

Thus, under the generous "played a part" causation standard for federal-sector retaliation claims, a reasonable juror could conclude that retaliatory animus motivated Thurman's decision-making and proximately caused Leonard's termination.

## B.    Race Discrimination

Next the court addresses Plaintiff's race discrimination claim.  Title VII mandates that "[a]ll personnel actions affecting [federal] employees . . . be made free from any discrimination based on race."  *Crain*, 63 F.4th at 591 (citing 42 U.S.C. § 2000e-16(a)).  So, as with his retaliation claim, to hold the VA liable under Title VII, Leonard must show that his race "played a part" in his removal.  *Id.*  (quotation marks and citation omitted).

22

The burden-shifting framework of *McDonnell Douglas v. Green*, 411 U.S. 792 (1973) remains one way in which courts evaluate claims of employment discrimination. *See Igasaki*, 988 F.3d at 957–58. Under this approach, once plaintiff presents prima facie evidence of discrimination, the employer may offer a legitimate, nondiscriminatory reason for adverse action, and "if the employer does so, the burden shifts back to the plaintiff to show that the employer's stated reason was a pretext." *Igasaki*, 988 F.3d at 957 (citation omitted). To make out a prima facie case of discrimination, an employee must show "(1) he is a member of [a] protected class; (2) he met his employer's legitimate job expectations; (3) he suffered an adverse employment action; and (4) similarly situated employees outside of the protected class were treated more favorably." *Dunlevy v. Langfelder*, 52 F.4th 349, 353 (7th Cir. 2022). The ultimate inquiry at the summary judgment stage is whether the evidence "permit[s] a reasonable factfinder to conclude that the plaintiff's race" played a part in the discharge. *Cf. Ortiz*, 834 F.3d at 766; *see also Igasaki*, 988 F.3d at 958. Accordingly, a court is tasked with weighing the evidence "as a whole . . . regardless of whether the court also analyzes the evidence pursuant to *McDonnell Douglas*." *Tyburski v. City of Chicago*, 964 F.3d 590, 598 (7th Cir. 2020) (internal quotation marks and citation omitted).

Plaintiff's prima facie case under the *McDonnell Douglas* framework fails at the fourth prong. This prong necessitates that Plaintiff identify other Hines employees that are "directly comparable to h[im] in all material respects so as to eliminate other possible explanatory variables [aside from race discrimination]." *Crain*, 63 F.4th at 592. Generally, courts require that the plaintiff and comparator "deal[t] with the same supervisor, are subject to the same standards, and have engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their employer's treatment of them." *Barbara v. Pearson Educ., Inc.*, 906 F.3d 621, 629 (7th Cir. 2018).

Here, Plaintiff offers two comparators: Lieutenant Cary Kolbe and Officer John Bailey, both white police officers at Hines. Plaintiff has not suggested that either reported to the same supervisor as Leonard or that either worked in the same role as Leonard (as a Criminal Investigator). Further, and more problematic, Plaintiff has not adequately alleged that either engaged in the same type of misconduct—specifically, that they failed to check out their weapons while on duty *and* that they failed to thoroughly conduct investigations of stolen/missing property. Plaintiff states, generally, that these two officers "engaged in far more serious conduct" than Leonard (Pl.'s Resp. to Summ. J. at 10) but fails to elaborate on how their misconduct stacks up against Leonard's, let alone provide the court with admissible evidence of their misconduct beyond conjecture. *See Carmody v. Bd. of Trs. of Univ. of Ill.*, 893 F.3d 397, 401 (7th Cir. 2018) ("[I]nferences that are supported by only speculation or conjecture will not defeat a summary judgment motion." (internal quotation marks and citations omitted)). Because Leonard has failed to put forth a sufficient comparator, the court need not proceed with the remainder of the *McDonnell Douglas* framework. *See Crain*, 63 F.4th at 592 n.5 (stating that the court need not address each prong of the prima facie case "because [plaintiff] fail[ed] to put forth a sufficient comparator"); *see also Brooks v. Avancez*, 39 F.4th 424, 435 (7th Cir. 2022).

Putting aside the *McDonell Douglas* framework, Plaintiff simply offers the court no admissible evidence that race discrimination played a role in his removal. The closest he comes in this regard is a statement that he heard from undisclosed individuals that they heard Thurman make racial slurs. (PSOF at 38 ¶ 9.) Leonard admitted during his deposition, however, that Thurman never directed slurs at him, nor did he ever personally hear Thurman make one. (Leonard Dep. at 91:3–92:24.) Likewise, Leonard could not recall a single instance where he felt that Director Ricard had shown prejudice against him based on his race. (*Id.* at 84:16–22.) Leonard's claim that a nameless person told him that they heard

24

Thurman utter racial slurs is plainly inadmissible. *See Gunville v. Walker*, 583 F.3d 979, 985 (7th Cir. 2009) ("A party may not rely upon inadmissible hearsay to oppose a motion for summary judgment.") Consequently, even the more flexible analysis offered by *Ortiz* is of no help to Plaintiff, and the court holds that no reasonable jury could find that race discrimination played a part in Leonard's removal from the VA.

## II.     Review of MSPB's Decision to Affirm Leonard's Removal

The court turns, finally, to Plaintiff's appeal of the MSPB's decision affirming his removal. As explained earlier, the AJ's decision sustaining Leonard's removal must be affirmed unless it is found to be "arbitrary, capricious, an abuse of discretion, not in accordance with law, obtained without proper procedures, or unsupported by substantial evidence." *Delgado*, 880 F.3d at 916 (citing 5 U.S.C. § 7703(c)). This standard permits the court to reverse the MSPB's decision only if "it is not supported by such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Hairston v. Dep't of Veterans Affs.*, 761 F. App'x 1005, 1007 (Fed. Cir. 2019) (internal quotation marks and citation omitted). Thus, unlike the court's preceding analysis of Plaintiff's Title VII claims that were conducted de novo, the court reviews the VA's removal decision with deference to the AJ's decision.

Plaintiff Leonard contends that the charges against him were not supported by substantial evidence and that the administrative judge committed various legal errors. The court addresses each of the charges in turn, and ultimately affirms the MSPB's decision.

### A.     Charge B, Specification 4

This charge was sustained based on a specification that charged Leonard with failing to conduct independent investigations of missing or stolen VA property after Chief Thurman met with him in October 2012 to discuss this performance issue. (R. 003987.) Specifically, the VA claimed that Leonard had a practice of simply "cut[ting] and past[ing]" template language into his reports of stolen goods. (*Id.* 003989.) Plaintiff notes that the Agency provided just one example of his

failure to independently investigate a claim of stolen goods, and argues, therefore, that the AJ could not find that he conducted more than one incorrect investigation, as the specification claims.

Leonard's argument ignores other evidence that supports the AJ's conclusion. First, the AJ found that Leonard and Thurman did in fact have a meeting in October 2012 where Thurman "directed him to thereafter conduct independent investigations, including witness interviews" because the Chief of Logistics at Hines, Thomas Huettemann, had complained that Leonard's investigations did not reflect independent work. (*Id.* 003989, 003995.) The AJ made this conclusion after making credibility determinations concerning Leonard and Thurman.[18] (*Id.* 003990.) At the hearing, Leonard did not deny that he met with Thurman on the topic of missing items reports, nor did he deny engaging in the practice of cutting and pasting template text into his reports. (*Id.* 003989.) Instead, Leonard maintained that Huettemann supported this practice and would not have wanted him to change his conduct, because Leonard's "cut and paste" method expedited the process of closing a backlog of incomplete investigations. (*Id.*) Leonard attempted to corroborate his claim by offering the declaration of Dan Modjewski, who worked under Huettemann in the Logistics department. Mr. Modjewski in fact confirmed Leonard's contention that Huetteman was chiefly concerned with the speed at which reports were being processed. (*Id.* 003992.)

Huettemann himself submitted a declaration that contradicted these claims, however. He stated in that declaration that he complained to Thurman about investigation reports that lacked specific findings and instead contained nearly identical verbiage and conclusions. (*Id.* 003991–92.) The AJ credited Huettemann's declaration over that of Modjewski, who was not present when Huettemann expressed his concerns to Thurman, nor when Thurman relayed those

---

[18]    In assessing credibility, the AJ addressed seven factors:  "(1) the witness' opportunity and capacity to observe the event or act in question (2) the witness' character (3) any prior inconsistent statement by the witness (4) a witness' bias or lack of bias (5) the contradiction of the witness' version of events by other evidence or its consistency with other evidence (6) the inherent improbability of the witness' version of events and (7) the witness' demeanor."  (R. 003990–95.)

concerns to Leonard.  (*Id.* 003992.)  And the AJ found Leonard's account of his October 2012 meeting with Thurman—in which Leonard asserted that Thurman met with Leonard to discuss his admittedly-deficient work, but did not direct him to make changes—"inherently improbable."  (*Id.* 003993.)

From here, the AJ concluded that it was more likely than not, based on all the evidence and "[Leonard's] tone of voice and demeanor" recounting his interpretation of what Thurman directed him to do after that meeting, that Leonard "decided on his own" to continue doing cursory investigations of stolen goods because he thought that was what Huettemann wanted.  (*Id.* 003999.)  As for whether Leonard actually conducted more than one faulty investigation after the October meeting, the AJ cites to Leonard's testimony where he does not deny that he worked on more investigations after the October 2012 meeting, and his claimed belief that Huetteman preferred a "cut and paste" methodology, making it likely that he continued the practice.  (*Id.* 003996.)  Additionally, the AJ points out that Thurman documented in a December 7, 2012 memorandum that Leonard continued to disobey his directive to conduct independent and thorough investigations.  (*Id.* 003997.)  A reasonable person could accept this evidence as adequate to support the conclusion that the VA proved the charge as written.

Plaintiff contends that the AJ should have discounted Thurman's testimony on this point as motivated by retaliatory animus.  The AJ acknowledged this concern but it did not alter her ultimate conclusion, which was largely based on the improbable nature of Leonard's testimony and Huettemann's corroboration of Thurman.  (*Id.* 003993.)  Accordingly, the court finds that the AJ's findings were reasonable and logical inferences, based on her assessment of the credibility of witnesses and the evidence presented.  *See Ahuruonye v. Dep't of Interior*, 757 F. App'x 937, 940 (Fed. Cir. 2018) (stating that MSPB credibility determinations "are virtually unreviewable on appeal" (internal quotation marks and citations omitted)).  Consequently, the AJ's conclusion that the VA proved Charge B by a preponderance of the evidence was not arbitrary, capricious, or unsupported by substantial evidence.

### B. Charge C, Specifications 1-3

The specifications of Charge C pertain to Leonard's noncompliance with the VA's policy requiring him to be in possession of his assigned weapon at all times while on duty. (*See id.* 001422–27.) In Specification 1, the VA alleged that Leonard violated this policy and was unarmed while on duty on fifty-one separate dates between October 2010 and July 2012. In Specification 2, the VA alleged that Leonard violated this policy on July 2, 2012 when he responded to a felony arrest scene unarmed. (*Id.* 001422–23.) Lastly, in Specification 3, the VA alleged that after being instructed on November 16, 2012 that he must be armed at all times while on duty, Leonard was again unarmed just five days later, on November 21, 2012. (*Id.* 001427.)

As for the first and second specifications, the AJ determined that the policy did apply to Leonard as a Criminal Investigator. She found, further, that Leonard admitted to being unarmed on the majority of the dates set forth in the specification and at the felony arrest scene on July 2, 2012, putting himself and others at risk. (*Id.* 001424–26.) Concerning the third specification, the AJ found that attendance records and weapons logs confirmed that Leonard was not armed for all hours while he was on duty on November 21, 2012. (*Id.* 001427–28.)

Leonard broadly challenges the AJ's findings on three grounds, none of which are successful. Leonard argues, first, that, as a Criminal Investigator, he had "great latitude in how to perform his duties" and was not required to follow the VA's firearm policies. In support, Leonard references the position description for Criminal Investigators at Hines where it lists the VA firearms policies as "guidelines." (*See Id.* 003149.) This argument faces two issues. First, Leonard did not raise this argument to the AJ in the first instance, so he has forfeited it from review in this court. *Sistek v. Dep't of Veterans Affs.*, 955 F.3d 948, 953 n.1 (Fed. Cir. 2020) (citing *Bosley v. Merit Sys. Prot. Bd.*, 162 F.3d 655, 668 (Fed. Cir. 1998) ("A party in an MSPB proceeding must raise an issue before the administrative judge if the issue is to be preserved for review in [federal] court.")). Even if this court were to consider this evidence, the cited materials do much less work than Leonard would like. The job description does not state that these policies are per se

28

inapplicable to Criminal Investigators; instead, it allows them leeway in "emergency circumstances" to "adapt" or "deviate" from the guidelines. (*See* R. 003149.) Leonard fails to allege or provide evidence supporting a theory that exigent circumstances required that he be unarmed on any of the dates supporting these charges. Furthermore, Plaintiff admitted to violating the policy on many of the dates set forth in Specification 1, and as the AJ notes in her opinion, "proof of any one act or event is sufficient to prove the charge." (*Id.* 001425 (citing *Burroughs v. Dep't of the Army*, 918 F.2d 170, 172 (1990)).)

Leonard next argues with respect to Specification 2 that his failure to be armed at the scene of the felony arrest on July 2, 2012 did not put others at risk, as the suspects already had been detained. The AJ did consider this argument and reasonably found that Leonard's decision to show up at a felony arrest scene unarmed rendered him "vulnerable, without means of defending himself and others if the situation changed." (*Id.* 001427.) Further, the AJ credited Chief Thurman's testimony that the appropriate response would have been for Leonard to "obtain a weapon before responding" to the crime or if he could not arm himself, that he should "not have reported to the scene" at all. (*Id.*) Leonard's argument in this regard constitutes mere disagreement with the AJ's findings and does not provide a basis for reversal.

Finally, Leonard's argument against Specification 3 is notably weak. Here, he does not dispute that he was not armed for all hours while on duty on November 21, 2012; instead, he claims that the reason he was not armed was because he was out delivering turkeys for his church before Thanksgiving. (*Id.* 001427–28.) He does not claim that he took personal time off to make these deliveries, but instead seems to suggest that his absence should be excused because he regularly left work early the day before Thanksgiving to do this. While his charitable acts are commendable, he has not explained why he chose to engage in the activity during work hours and has effectively admitted that he was not only unarmed on November 21, 2012, but was in fact not working at all.

29

Accordingly, the AJ's conclusion that the VA proved Charge C, Specifications 1-3 by a preponderance of the evidence was not arbitrary, capricious, or unsupported by substantial evidence.

### C.      Nexus Between Charges and Leonard's Position

Next, Plaintiff argues that the VA failed to establish a nexus between his job performance and the alleged misconduct.  An agency may remove an employee "only for such cause as will promote the efficiency of the service."  5 U.S.C. § 7513(a).  To satisfy the "efficiency of service" requirement, the VA "must show by preponderant evidence that the employee's misconduct is likely to have an adverse impact on the agency's performance of its functions."  *Howard v. Dep't of Air Force*, 680 F. App'x 961, 970 (Fed. Cir. 2017) (internal quotation marks and citation omitted). According to Plaintiff, the VA failed to meet its burden here because it did not give proper weight to testimony of Leonard's supervisor (Assistant Chief Runge) that Leonard's failure to have his firearm on him at various times did not impact his performance and that there were no problems with his investigations.  Whatever the merit of Runge's opinion on this score, it does not undermine the evidence supporting the sustained charges against Leonard.  The AJ aptly summarized her nexus findings by explaining:

> I have found that he failed to properly perform the duties of his Criminal Investigator position when he failed to independently investigate reports of lost agency equipment.  I have also found that he failed to follow established police procedures that required him to be armed while on duty meaning he could not immediately provide an armed response if called upon to do so.  This misconduct goes to the essence of the duties he is to provide the agency.

(*Id.* 001432.)  A reasonable person could conclude from the evidence, as the AJ did, that Plaintiff's conduct directly interfered with the VA's law enforcement efforts.  The AJ's conclusion that the VA proved a nexus between Leonard's misconduct and the agency's work was not arbitrary, capricious, or unsupported by substantial evidence.

### D.  Reasonableness of Penalty

Plaintiff also argues that the VA's penalty of removal was unreasonable and that the AJ's finding otherwise was not supported by substantial evidence.  Penalty determinations must be reasonably based on an analysis of the twelve relevant factors set forth in *Douglas v. Veterans Admin.*, 5 M.S.P.B. 313, 332 (1981).[19]  *See Connor v. Dep't of Veterans Affs.*, 8 F.4th 1319, 1324 (Fed. Cir. 2021).  *Douglas* identifies twelve factors, but "does not mandate that any particular factor be given special treatment, or that all factors be considered in every case without regard to their relevancy."  *Zingg v. Dep't of Treasury, IRS*, 388 F.3d 839, 844 (Fed. Cir. 2004) (citing *Nagel v. Dep't of Health & Human Servs.*, 707 F.2d 1384, 1386) (Fed. Cir. 1983)).  Moreover, the Federal Circuit has held that an agency's choice of penalty "will not be overturned unless the agency's choice of penalty is wholly unwarranted in light of all the relevant factors."  *Valles v. Dep't of State*, 17 F.4th 149, 153 (Fed. Cir. 2021) (internal quotation marks and citations omitted).

In evaluating whether removal was an appropriate penalty here, the AJ prioritized the seriousness of the sustained charges, deeming this the "most significant" factor in her analysis. (R. 004003–04.) Specifically, the AJ concluded that Leonard's failure to carry his firearm rendered him incapable of "protect[ing] persons and property" (*id.*  004003) and that his refusal to conduct

---

[19]     The twelve *Douglas* factors include: "(1) The nature and seriousness of the offense, and its relation to the employee's duties, position, and responsibilities, including whether the offense was intentional or technical or inadvertent, or was committed maliciously or for gain, or was frequently repeated; (2) the employee's job level and type of employment, including supervisory or fiduciary role, contacts with the public, and prominence of the position; (3) the employee's past disciplinary record; (4) the employee's past work record, including length of service, performance on the job, ability to get along with fellow workers, and dependability; (5) the effect of the offense upon the employee's ability to perform at a satisfactory level and its effect upon supervisors' confidence in the employee's ability to perform assigned duties; (6) consistency of the penalty with those imposed upon other employees for the same or similar offenses; (7) consistency of the penalty with any applicable agency table of penalties; (8) the notoriety of the offense or its impact upon the reputation of the agency; (9) the clarity with which the employee was on notice of any rules that were violated in committing the offense, or had been warned about the conduct in question; (10) potential for the employee's rehabilitation; (11) mitigating circumstances surrounding the offense such as unusual job tensions, personality problems, mental impairment, harassment, or bad faith, malice or provocation on the part of others involved in the matter; and (12) the adequacy and effectiveness of alternative sanctions to deter such conduct in the future by the employee or others." *Douglas*, 5 M.S.P.B. at 332.

thorough and independent investigations went "to the heart of [his] duties as a law enforcement officer" (*id.* 004004). In his role as a law enforcement officer, the AJ observed, Leonard was held to a "higher standard of conduct, especially in situations involving the use of weapons." (*Id.* 004003.) She also carefully compared the penalty of termination with the sanctions imposed on other employees for the same or similar offenses and concluded that Leonard had not shown that similarly situated employees were treated more favorably. (*Id.* 004004–06.) The AJ noted, further, that this was Leonard's second disciplinary offense, with the first being Leonard's altercation with Kolbe in December 2011 (*id.* 004006), and that on multiple occasions Leonard was explicitly placed on notice of the policies he violated by Chief Thurman (*id.* 004007). Additionally, the AJ found that because Leonard deliberately disregarded his superior's directives, there was little "potential for rehabilitation," and alternative sanctions were unlikely to be adequate or effective. (*Id.*) Finally, the AJ considered mitigating factors, including Leonard's lengthy service and his generally good work record, but found that these factors did not overcome the seriousness of Leonard's misconduct. (*Id.* 004007.)

Leonard challenges the reasonableness of the penalty primarily by asserting that his removal was a disparate penalty, or in other words that the AJ did not give proper weight to *Douglas* factor six. Specifically, Plaintiff argues that the AJ erred in rejecting his proffered comparators, John Bailey and Cary Kolbe, both of whom failed to check out their weapons on various days while on duty according to the VA's archived firearms logs. (*See* 003070–74; 003081–82 (containing charts showing dates that Kolbe and Bailey did not draw their firearm).) Again, however, the AJ did consider the evidence that Leonard presented on this issue and concluded that these comparators had not engaged in comparable misconduct:

> [Leonard] cites as comparators other officers who did not draw their weapons, potentially similar misconduct for two of the three specifications of [Charge C]. [He] does not cite any comparators who also failed to properly perform the duties of their position [referring to Charge B, Specification 4] and received lesser or no discipline. Nor does he cite any other instance where an officer decided to go to the scene of a felony arrest unarmed . . . . Citing comparators who engaged in some, but not all of the types of misconduct at issue does not suffice in making the

initial showing required of those asserting that a penalty is disparate. *See Reid v. Dep't of the Navy*, 118 M.S.P.R. 396, ¶¶ 22-23 (2012) (proffered comparators were not similarly situated for purposes of establishing a disparate penalties claim where the administrative judge sustained three charges against the appellant, and the appellant alleged that the comparators misconduct was similar as to only one charge).

(*Id.* 004005–06.)  Leonard identifies no comparator evidence that the AJ failed to consider; he does nothing more than dispute her conclusions, which were reasonable and supported in law.

Lastly, Leonard argues that the AJ did not thoroughly consider Thurman's retaliatory animus as a mitigating factor under *Douglas* factor eleven.  While Plaintiff is correct that the AJ's penalty analysis section does not explicitly mention this issue, elsewhere in her opinion she devotes significant analysis to evidence of Thurman's retaliatory animus.  For instance, she devotes four pages of analysis to Leonard's affirmative defense of retaliation and concludes that Thurman's retaliatory animus was a motivating factor in Leonard's removal (*id.* 003997–00400), but that the agency "would have removed [Leonard] absent any discriminatory or retaliatory motive" (*id.* 00401).  The AJ supported her conclusion by citing to Director Ricard's testimony that she considered Leonard's allegations of EEO retaliation in making her decision but ultimately found that the seriousness of the misconduct outweighed any impact of the retaliatory motive. (*Id.*)

The court finds that the AJ's penalty analysis was supported by substantial evidence and that Plaintiff has not shown that the VA's choice of penalty was "wholly unwarranted in light of all the relevant factors."  *Valles*, 17 F.4th at 153.

### E.    Affirmative Defense of Retaliation

Finally, Leonard maintains that the VA failed to rebut his affirmative defense of retaliation. Indeed, the majority of Plaintiff's Petition for Review is directed at this issue.  However, as Defendant points out, and as the court has already explained earlier in its opinion, the only issue for resolution presented in Leonard's Petition for Review is whether he can establish that any of the narrow grounds for reversal under 5 U.S.C. § 7703(c) are present with respect to his

*nondiscrimination* claims. Plaintiff's discrimination claims brought under Title VII are reviewed separately, de novo. *See* 5 U.S.C. § 7703(c). As explained above, Plaintiff's Title VII retaliation claim survives that de novo review.

## **CONCLUSION**

For the reasons detailed above, Defendant's motion for summary judgment [54] is denied in part and granted in part and Plaintiff's Petition for Review [58] is denied. What remains of Plaintiff's action is his Title VII retaliation claim. The court cautions that a finding of liability under the "played a part" standard used in federal-sector retaliation claims may not require an award of lost wages or compensatory damages, which Plaintiff requests in his complaint. *See Huff*, 42 F.4th at 652. As the Seventh Circuit has explained, a plaintiff "must demonstrate that the requested relief 'redress[es] the alleged injury.' " *Id.* (citing *Babb v. Wilkie*, 140 S. Ct. 1168, 1177 (2020) ("[B]ut-for causation is important in determining the appropriate remedy.")). For now, the court holds only that a dispute of material fact remains for trial.


ENTERED:

Dated: March 6, 2024

_____

REBECCA R. PALLMEYER
United States District Judge

34