**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| MICHAEL LEONARD, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No.  1:17 C 09259 |
| | ) | |
| DOUG COLLINS, Secretary, U.S. | ) | Judge Rebecca R. Pallmeyer |
| Department of Veterans Affairs, | ) | |
| | ) | |
| Defendant. | ) | |

<u>**MEMORANDUM OPINION AND ORDER**</u>

For over 25 years, Plaintiff Michael Leonard ("Plaintiff") worked as a Criminal Investigator at the U.S. Department of Veterans Affairs ("VA" or "the government") facility in Hines, Illinois.  In 2013, he was fired by the VA.  In this lawsuit against the VA, Leonard alleged that he was unlawfully discharged because of his race, and in retaliation for prior protected activity, in violation of Title VII of the Civil Rights Act of 1964.  The court granted summary judgment in favor of the government on the race-discrimination claim, but allowed the retaliation claim to proceed.  By the time of the long-delayed trial on that claim, Leonard had physical challenges and was able to testify only for a few minutes.  The parties nevertheless agreed to proceed, presenting Leonard's deposition testimony to the jury—which returned a verdict in his favor.  Leonard now seeks an award of backpay and entry of final judgment.  As explained below, the court will award backpay and prejudgment interest of approximately $812,342.47, and will order the government to credit him with years of service towards his federal retirement benefits.

<u>**DISCUSSION**</u>

The court assumes the parties' familiarity with the factual and procedural background of this case, which was explained in some detail in the court's summary judgment order.  *See generally* S.J. Order [92], 2024 WL 965192 (N.D. Ill. Mar. 6, 2024).  Having proven his claim of retaliation to a jury, Mr. Leonard is entitled to an award of back pay, and the district court has

"broad equitable discretion" in making that award. *Frey v. Coleman*, 903 F.3d 671, 682 (7th Cir. 2018) (citing *David v. Caterpillar, Inc.*, 324 F.3d 851, 865 (7th Cir. 2003)). "Backpay is a reasonable estimate of the harm suffered as a result of the [retaliation], determined by (1) measuring the differences between actual earnings for the period and those which [plaintiff] would have earned absent the discrimination by [the] defendant and (2) reducing that amount if the defendant can show failure to take reasonable efforts to mitigate [his] damages." *E.E.O.C. v. Costco Wholesale Corp.*, 903 F.3d 618, 629 n.6 (7th Cir. 2018) (internal quotation marks omitted) (quoting *Horn v. Duke Homes*, 755 F.2d 599, 606–08 (7th Cir. 1985)).

The parties have submitted cross-briefs in support of their competing proposals for the appropriate award. Leonard requests roughly $1.2 million, consisting of his lost salary, lost benefits, lost availability pay, lost retention bonuses, and the like, as well as a court order directing the government to grant him 11 years credit towards his Federal Employee Retirement System ("FERS") benefits. (Pl. Br. [159] at 1–13.) The government asks the court to decline relief altogether, noting that Leonard was fired—at least in part—due to substantiated complaints of official misconduct during his time at the VA, and that he would have been fired regardless due to a DUI shortly after his termination. (*E.g.,* Gov. Resp. Br. [160] at 2–3, 20.) The court's resolution of the disputed issues follows.

## I.      Lost Salary

### A.      Government's Objections

As an initial matter, the government objects to any award of back pay, offering two primary arguments. Neither is persuasive.

First, the government claims that because Mr. Leonard engaged in misconduct at the VA, he would have been terminated regardless of the VA's actions, and thus is not due any backpay. Defendant is correct that the Merit Systems Protection Board rejected Plaintiff's challenge to his discharge and this court, under a deferential standard of review, upheld that decision. S.J. Order, 2024 WL 965192, at *13–14. But Leonard's Title VII retaliation claim survived summary judgment,

2

and the jury concluded, despite hearing evidence of his misconduct, that but for retaliation, he would not have been terminated. The evidence at trial was sufficient to support that finding: Similarly situated VA employees engaged in misconduct akin to, or more serious than, Leonard's, but were not terminated (or, in some instances were not disciplined harshly at all). The jury also heard "smoking gun" evidence that managers were determined to rid the VA of employees who, like Plaintiff, had complained of race discrimination. In short, despite evidence of Plaintiff's misconduct, *see id.* at *5–7 (describing evidence of overtime fraud and various other instances of misconduct), the jury's conclusion that his termination ran afoul of Title VII's retaliation provisions means he is "presumptively entitled to backpay." *See Stragapede v. City of Evanston*, 865 F.3d 861, 868 (7th Cir. 2017). The court sees nothing here that disturbs that presumption.

Second, the government contends that a DUI charge that Leonard incurred one month after his termination precludes a backpay award. (Gov. Br. [155] at 6.) Leonard pleaded guilty to the charge, and served a period of supervision. (Criminal Sentence Order [158-3] at 13.) But the government has not firmly established that a misdemeanor DUI conviction, had it occurred during his employment at the VA, would necessarily have resulted in Leonard's termination from federal employment. Joan Ricard, the Director of the Hines VA Hospital, has asserted in a Declaration that, had Plaintiff been employed at the time of the DUI, Ricard would have revoked his arrest authority and placed him "on paid administrative office duty for the duration of Plaintiff's criminal prosecution." (Ricard Decl. [156] ¶ 9.) Ms. Ricard also speculates about what would have occurred following his "criminal DUI conviction," but does not state definitively that he would have been terminated. (*Id.* ¶ 10.) She instead leaves open the possibility that he would have been offered a lower-paying position at the VA. (*Id.* ¶ 9.) Notably, the DUI arrest did not preclude further security-related employment: Leonard began working at All Points Security in September 2014. (Pl. Dep. [163-1] at 8:2–13, 10:2–18; 20:18–22:19), albeit at a lower rate of pay. And, of course, the government's claim that his DUI arrest would have still happened had he remained at

3

the VA (versus being unemployed) is wholly speculative.  The court declines to cut off the VA's backpay liability at the date of the DUI charge.

Thus, for purposes of backpay, the court will assume that Leonard would have remained employed at the VA from March 8, 2013 (when he was terminated) until January 27, 2025 (when Mr. Leonard testified at trial).  The court assumes, further, that Leonard would have accrued vacation and sick leave time, as well as retirement benefits, at the same rate as any other employee in his position at the VA.  (*See* Minute Order [185] (stating that the court "will assume for purposes of the damages award that Plaintiff would have continued working to the date of the trial").)  The result is, of course, very generous to Leonard, as it assumes he would have remained employed at the VA for 12 years following his termination.  The average retirement age for VA police officers nationwide is 63.5 years.  (Gov. Resp. Br. [160] at 9.)  Leonard was past 70 years old at the time of trial, and was in poor physical and mental condition, hence unable to complete his testimony.  The government is right to question his ability to work.  On the other hand, however, Leonard had indeed continued working as a security guard, in at least some capacity, up to the time of trial.  And his poor health at the time of a stressful federal jury trial may not be an accurate barometer of his fitness for work in a job he had performed for years.  The court therefore assumes that Leonard would have remained at work through January 27, 2025, had he not been terminated.[1]

### B.    Leonard's Lost Pay

In considering the appropriate award, the court begins by considering publicly available federal employee pay tables, copies of which are in the record.  At the time of his termination from

---

[1]    The court notes its conclusions in this respect are subject to challenge, and the court offered the parties the opportunity to present evidence and argument at an in-person hearing; both parties filed a joint status report [186] on April 7, 2026, declining this opportunity and asking the court to rule instead based on their previous written submissions.  While Leonard bears the overall burden to show entitlement to backpay, the government bears the burden to show that Leonard failed to mitigate his damages.  The court concludes, as explained below, that the government met the burden only in a limited way.

4

the VA, Leonard was compensated at GS-11, Step 5, which corresponds to an annual salary of $71,296. (Pl. Ex. C [159-3] at 2; Pl. Resp. Br. [163] at 17.)

Leonard claims that he would have received four step-grade promotions from 2013 through 2024. Specifically, he claims that he would have been promoted: (1) to GS-11, Step 6 in 2015; (2) to GS-11, Step 7 in 2017; (3) to GS-11, Step 8 in 2020; and (4) to GS-11, Step 9 in 2023.[2] (Pl. Br. [159] at 3–4.) He contends that such increases are automatic following 104 weeks at each step with respect to steps "4, 5, and 6," and 156 calendar weeks with respect to steps "7, 8, and 9." (*Id.* at 3); 5 U.S.C. § 5335(a)(3). According to Leonard, this would have resulted in the following salary scale:

| Year | Salary |
|------|--------|
| 2013 | $71,296.00 |
| 2014 | $72,010.00 |
| 2015 | $74,870.00 |
| 2016 | $75,823.00 |
| 2017 | $79,653.00 |
| 2018 | $81,168.00 |
| 2019 | $84,978.00 |
| 2020 | $87,549.00 |
| 2021 | $88,430.00 |
| 2022 | $90,783.00 |
| 2023 | $97,518.00 |
| 2024 | $102,590.00 |
| 2025 | $104,692.00 |

(Pl. Br. [159] at 4.) The government objects to these proposed salaries, noting that, under federal law, step increases for federal employees are "tied to performance" and requires "an acceptable level of performance" and a "rating of at least 'fully successful.'" (Gov. Resp. Br. [160] at 10

---

[2] Many federal employees are paid using tables from the Office of Personnel Management that set salary based on "grades" and "steps." (*See, e.g.*, [159-3] at 13.) The prefix "GS" is typically used to refer to the grades, not steps. Leonard appears to confuse the two, referring to "promotions" from "GS-11, Step 6" to "GS-7" in 2017, "GS-8" in 2020, and "GS-9" in 2023. Changes of this nature would constitute a demotion, not a promotion. Based on context, the court assumes that Leonard intended to claim that he would have been promoted to Steps 7, 8, and 9 on the same schedule.

(quoting 5 C.F.R. §§ 531.407(a), 335.104).)  It argues that Leonard cannot show that he would have been entitled to these performance-based promotions had he remained at the VA.

The court agrees with the government.  Leonard has offered no basis for his assumption that he would have been promoted four times had he remained at the VA.  His apparent contention that such increases are automatic is belied both by federal law (which ties promotion to performance) and by Leonard's own history: as he acknowledges in his brief, Leonard was put on the GS-11, Step 5 scale on February 15, 2009 (the date he was promoted to the Criminal Investigator position), but was still at GS-11, Step 5 over four years later when he was terminated. (Pl. Br. [159] at 3 n.3.)  If step increases were truly automatic after 104 weeks, Plaintiff would have been promoted twice prior to his termination.[3]

Without a more concrete basis for Mr. Leonard's assumption of regular promotions, the court will assume that he would have remained employed at GS-11, Step 5, with no further promotions.  That results in the following lost pay, prorated for the dates March 8, 2013, through January 27, 2025:

| Year | Full Standard Pay at GS-11, Step 5 | Prorated Lost Pay |
|---|---|---|
| 2013 | $71,296.00 | $58,404.12 |
| 2014 | $72,010.00 | $72,010.00 |
| 2015 | $72,731.00 | $72,731.00 |
| 2016 | $73,657.00 | $73,657.00 |
| 2017 | $75,228.00 | $75,228.00 |
| 2018 | $76,658.00 | $76,658.00 |
| 2019 | $78,086.00 | $78,086.00 |

---

[3]    There are other problems with Plaintiff's claimed damages award: the amount he seeks assumes, without any explanation or evidence, that his promotions would be retrospective to the beginning of the calendar year.  For instance, Plaintiff claims he would have received a promotion from Step 7 ($85,183) to Step 8 ($87,549) in February 2020—that is, several weeks into the year.  (Pl. Br. [159] at 3–4.)  Yet he requests the award of $87,549 for the *entire year*, and presents no evidence that such raises are retroactive.  In addition, Plaintiff was terminated in March 2013, and presumably paid until then, but seeks recovery of a full year's salary for 2013. (*Id.* at 4.)  He also claims lost salary of $84,978 in 2019, which he claims aligns with GS-11, step 7.  That figure does not match the OPM table—in reality, he would have received $82,681.  (Pl. Ex. C [159-3] at 8.)  These errors in Plaintiff's submissions undermine confidence in his proposed calculations.

6

| 2020 | $80,451.00 | $80,451.00 |
| 2021 | $81,259.00 | $81,259.00 |
| 2022 | $83,423.00 | $83,423.00 |
| 2023 | $87,254.00 | $87,254.00 |
| 2024 | $91,792.00 | $91,792.00 |
| 2025 | $93,674.00 | $6,929.31 |

(*See* Pl. Ex. C [159-3].)

### C.  Mitigation

Having established the amount of salary he lost, the court turns to the issue of mitigation of damages.  To prevail on this issue, the government bears the burden of showing "(1) that the plaintiff was 'not reasonably diligent in seeking other employment,' and (2) that 'with the exercise of reasonable diligence there was a reasonable chance that the [plaintiff] might have found comparable employment."  *Vega v. Chicago Park Dist.*, 954 F.3d 996, 1009 (7th Cir. 2020) (Barrett, J.).  Failure to mitigate is an affirmative defense on which the defendant bears the burden of proof, *id.*, and a successful showing can result in a reduced or eliminated backpay award.  *See Stragapede*, 865 F.3d at 868.

All parties acknowledge that Leonard obtained alternate employment at some point in 2014, and that he earned a total of ~$400,000 at that job through 2024 (an average of ~$36,000 per year during this period).  The parties also agree that Mr. Leonard's recovery should be reduced by his alternate earnings.  (*E.g.,* Pl. Br. [159] at 8–9.)  But the government requests a further reduction, arguing that Leonard could have obtained a higher paying job, but did not attempt to do so, and instead opted to give up on the job search.  The government's vocational expert, Dr. Daniel Wolstein, claims that Leonard was qualified—and could reasonably have obtained—a set of jobs paying salaries ranging from $71,983 to $116,108.[4]  (Wolstein Rep. [157-

---

[4]  Plaintiff claims that the government did not disclose his testimony pursuant to FED. R. CIV. P. 26(a)(2)(D).  (Pl. Resp. Br. [163] at 18.)  That rule requires disclosure for expert witnesses used "at trial," and though Dr. Wolstein did not in fact testify at trial, his testimony is being offered here for evidentiary purposes.  The court nevertheless declines to strike that

1] at 13.)  The government contends that Leonard's failure to find one of these jobs constitutes a failure to mitigate his damages, and ought to reduce his recovery.

The VA is correct that a plaintiff who was wrongfully fired may not simply sit on their hands and wait for a court order of backpay, but must instead work diligently to find comparable employment.  *See Vega,* 954 F.3d at 1009; *Meyer v. United Air Lines, Inc.*, 950 F. Supp. 874, 876 (N.D. Ill. 1997) (a Title VII plaintiff owes "an obligation to remain actively in the labor force seeking a substantially equivalent position").  It is also true that Mr. Leonard's efforts to obtain alternative employment were relatively lackluster: during his deposition, he could not name any job that he applied for, had no records of any job search, and testified only to "an interview or two" in 2013 and 2014.  (Gov. Resp. [160] at 19–20.)  He also refused to provide an estimate of how much time he spent looking for jobs, and strongly suggested that he gave up looking for jobs entirely after his DUI arrest.[5]  (*Id.* at 20.)

Leonard's deposition testimony shows that his job-search was not robust.  His apparent decision to give up on the job search entirely in the months following his DUI is especially disappointing.  The DUI arrest could well have complicated his job search, but that arrest was obviously no fault of the VA.  The court will therefore assume that but for the DUI, he would have earned at least $19,729 in substitute pay in 2013 (the same amount he earned in 2014).

But as for the remaining years, the court finds that Leonard appropriately mitigated his damages by finding appropriate employment.  In 2014, he obtained a job working in private

---

testimony.  The government's late disclosure of Wolstein came only after Plaintiff's own late disclosure of his damages claim.  It would be unfair to the government to reject Dr. Wolstein's testimony on this record.  (*See* Gov. Mot. in Limine [118] at 11–12; Gov. Resp. [160] at 20–21.)

[5]      Plaintiff's DUI arrest likely deflated his job prospects, but this hardly supports the notion that it should inflate his recovery here.  The conduct leading to the arrest was not the result of any action by Defendant, and allowing Plaintiff to benefit from it raises obvious concerns of moral hazard.  *See Brady v. Thurston Motor Lines*, 753 F.2d 1269, 1278–79 (4th Cir. 1985) ("To permit claimants the freedom of substantially unrestrained conduct during interim employment, unfettered by the loss of back pay, would serve only to punish the employer for the misconduct of the claimant, and be inconsistent with the requirement of exercising reasonable diligence.").

security despite his age, record of termination from the VA, and DUI conviction.  He remained employed for the subsequent decade, and earned a respectable salary (albeit less than what he had been earning at the VA).  The VA bears the burden of showing Leonard failed to mitigate; as then-Judge Barrett pointed out in *Vega*, the government must prove that there was a "*reasonable chance* that the [plaintiff] might have found comparable employment."  954 F.3d at 1009 (emphasis added).  The government's evidence on this point is not compelling.  The government offers the report of Dr. Wolstein, who asserts that Leonard could have obtained a job paying essentially as much as he was making at the VA, had he expended a reasonable amount of effort.  But Wolstein spoke about job openings only in general terms, and never identified any precise openings or actual vacancies for which Leonard would have been qualified, much less that available positions would have offered the same promotional opportunities, job security, or working conditions as Leonard enjoyed at the VA.  *See Sintos v. City of Chicago*, No. 21 C 5327, 2025 WL 1807888, at *8 (N.D. Ill. July 1, 2025) ("[C]omparable employment involves a position with virtually identical promotional opportunities, compensation, job responsibilities, working conditions and status" (citation and quotations omitted)).  And Wolstein entirely ignored Leonard's age and work history—particularly the fact that he had been fired by the VA and filed suit—circumstances that might well have interfered with his job prospects.  The court has not excluded Wolstein's testimony under FED. R. EVID. 702, but does not find Wolstein's report sufficient to show that there was a "reasonable chance" that Leonard could have made substantially more money had he made a greater effort.  *Stragapede*, 865 F.3d at 868–69 ("The plaintiff's backpay award should not be reduced based on failure to mitigate if reasonably diligent effort would not have been likely to produce comparable employment.").

The court will therefore reduce Leonard's backpay award by the substitute wages shown in the chart below.  Because Leonard has not presented evidence of his actual earnings for 2025, the court will prorate his 2024 salary ($51,000) for the period from January 1, 2025, through January 27, 2025.

| Year | Substitute Earnings |
|------|---------------------|
| 2013 | $19,729 |
| 2014 | $19,729 |
| 2015 | $25,800 |
| 2016 | $22,800 |
| 2017 | $32,056 |
| 2018 | $38,756 |
| 2019 | $38,750 |
| 2020 | $43,857 |
| 2021 | $49,999 |
| 2022 | $44,230 |
| 2023 | $33,153 |
| 2024 | $51,000 |
| 2025 | $3,773 |

## II.      Retention Bonus

Mr. Leonard also claims he is entitled to an award for lost retention bonuses.  (Pl. Br. [159] at 5.)  He asserts that the criminal investigators who succeeded him at the Hines facility earned retention bonuses ranging between 6% and 25% from 2015 through 2024, and argues that he is entitled to the same retention bonuses, at the same percentages, for those nine years.  (*Id.* at 6.) The total requested amount is roughly $93,000.  (*Id.*)  The court declines to award this relief. Leonard's entitlement to retention pay is wholly speculative.  As the government notes, retention bonuses are used "strategically and prudently" to "retain employees with high or unique qualifications . . . [who] are likely to leave Federal service without an incentive."  (Gov. Resp. Br. [160] at 11.)  The fact that other police officers at the Hines facility were awarded these bonuses in no way establishes that Leonard would have.  His request for a retention bonus award is denied.

## III.      Overtime and Availability Pay

Leonard's request for lost overtime and "availability pay" is also based on the experience of his successors at Hines.  (Pl. Br. [159] at 6–7.)  Specifically, he claims these successors worked approximately 82 hours of overtime a year, and that it is "reasonable to conclude that Plaintiff would have worked the same amount" over the course of 12 years "if Defendant had not terminated Plaintiff's employment in violation of Title VII."  (*Id.*)  The court recognizes that this

request, too, is speculative, but the fact that fellow employees regularly earned overtime pay suggests that some award of this nature is appropriate.[6] The court will assume that Plaintiff would have worked 82 hours a year in overtime, and would have received 1.5 times his hourly rate for those hours. (*See* Exhibit A.) This results in the following overtime award:

| Year | Full Standard Pay at GS-11, Step 5 | Hourly Pay | Prorated Overtime Hours | Projected OT Earnings at 1.5 times hourly rate |
|---|---|---|---|---|
| 2013 | $71,296.00 | $34.28 | 67.17 | $3,453.57 |
| 2014 | $72,010.00 | $34.62 | 82 | $4,258.28 |
| 2015 | $72,731.00 | $34.97 | 82 | $4,300.92 |
| 2016 | $73,657.00 | $35.41 | 82 | $4,355.68 |
| 2017 | $75,228.00 | $36.17 | 82 | $4,448.58 |
| 2018 | $76,658.00 | $36.85 | 82 | $4,533.14 |
| 2019 | $78,086.00 | $37.54 | 82 | $4,617.59 |
| 2020 | $80,451.00 | $38.68 | 82 | $4,757.44 |
| 2021 | $81,259.00 | $39.07 | 82 | $4,805.22 |
| 2022 | $83,423.00 | $40.11 | 82 | $4,933.19 |
| 2023 | $87,254.00 | $41.95 | 82 | $5,159.73 |
| 2024 | $91,792.00 | $44.13 | 82 | $5,428.08 |
| 2025 | $93,674.00 | $45.04 | 6.06 | $409.41 |

Leonard also requests $23,623 of "availability pay" for the year 2024. (Pl. Br. [159] at 9.) The court understands availability pay to be provided to officers who are available for overtime, even if they do not actually work any overtime. *See* 5 U.S.C. § 5545a (authorizing pay for criminal investigators who are "generally and reasonably accessible" for performing "unscheduled duty" that is not "part of the 40 hours in the basic work week of the investigator"). Leonard rests his calculation on the availability pay received by a single VA officer in 2024. The court declines to award this amount, for two reasons. First, the fact that a single VA employee received availability

---

[6] The court declines to consider, as a barometer, the hours of overtime that Plaintiff claimed prior to his termination, as there was evidence presented at trial that Plaintiff was reliably accused, and investigated by the VA, for padding his overtime hours prior to his termination. *See* 2024 WL 965192, at *3–4. To illustrate, Plaintiff claimed an annualized rate of 268 overtime hours in 2012 (Gov. Br. [160] at 14), far more than the 82 hours he claims his coworkers worked.

11

in a single year is hardly indicative that Leonard would have received it.  Second, the court is awarding overtime pay, so any availability pay award would be redundant of that award.

## IV.  Sick Leave

Next, Leonard requests that the court credit him with "a total of 1,232 hours of sick leave," the amount he claims he would have received had he not left federal employment.  (Pl. Br. [159] at 11.)  Specifically, he says that he would have earned "108 hours of sick leave per year from March 8, 2013, to December 31, 2024." (*Id.*)  It is not clear why he desires credited sick time— the government speculates that "the sick leave credit would boost his monthly [retirement] annuity." (Gov. Resp. Br. [160] at 16 n.13.)  Regardless of the reason, the court agrees that sick leave credit is appropriate here.  But Plaintiff's figures are overinclusive, as his calculations assume that he would not have used any sick leave from 2013 to 2025 had he remained employed at the VA.  That assumption is inconsistent with evidence that he in fact used "an annual average of 59.667 hours" of sick time per year.  (*Id.* at 16.)  The court will award credit for the sick leave that Plaintiff would have accrued from March 8, 2013, through January 27, 2025, less 59.667 hours per year.

## V.  Lost Vacation Time

Had he remained employed, Leonard contends that he would have earned "8 hours of vacation time per pay period, per year," which works out to "208 hours of vacation pay per year." (Pl. Br. [159] at 10.)  He further claims that the value of this time is $138,817.00.  (*Id.*)  This figure is, as the government points out, also flawed: it assumes that Leonard would have not used any vacation time (he in fact used an average of ~154 hours per year).  (Gov. Resp. Br. [160] at 16.) It also assumes that he could have accrued over a thousand hours of vacation time, an incorrect assumption because federal law caps accumulation of vacation time at 240 hours (30 days).  5 U.S.C. § 6304(a).  The court will therefore credit him 240 hours of vacation time.  In 2025, his

salary would have been $93,674.00, which is approximately $45.04 per hour.[7]  The value of 240 vacation hours is, thus, $10,808.54.  The court will add this amount to his lost earnings for the year 2025.  (*See* Exhibit A.)

## VI.   Retirement Benefits

Next, Mr. Leonard contends that he is entitled to retirement benefit credits that he would have earned had he remained employed at the VA.  He claims he should have earned "1.1 percent of his high-3 average salary for each year of service for his retirement annuity," and requests an "additional 11 years of service credit towards retirement under FERS in addition to his 35 years of existing service credit at the time he was unlawfully terminated."  (Pl. Br. [159] at 11.) Recognizing that retirement benefits are a critical part of any employee's compensation, even more so for an individual closer to retirement, the court grants this request and directs the government to credit Mr. Leonard with the benefits he would have accrued had he remained employed through January 27, 2025 (the day of his testimony), and to take steps necessary to effectuate such relief.

## VII.   Prejudgment Interest

Because the "goal is to make a plaintiff whole following violations of a federal statute," district courts have discretion to award prejudgment interest to prevailing Title VII plaintiffs.  *Frey*, 903 F.3d at 682.  Leonard asks for the federal prime rate (~4%), a figure that the Seventh Circuit has referred to as the "benchmark" for awards of prejudgment interest.  *See First Nat'l Bank of Chicago v. Standard Bank & Tr.*, 172 F.3d 472, 480 (7th Cir. 1999).  Defendant, relying on *Cement Division, National Gypsum Co. v. City of Milwaukee* (*Cement Division I*), 31 F.3d 581, 587 (7th Cir. 1994), *aff'd*, 515 U.S. 189 (1995), and the effectively risk-free obligation of payment by the federal government, instead asks the court to calculate interest based on the one-month Treasury Bill rate.  (Gov. Resp. Br. [160] at 15.)

---

[7]  A worker who works 40 hours per week for 52 weeks works approximately 2080 hours per year.  Dividing his salary of $93,674 by 2080 hours yields an hourly pay of $45.04.

The court agrees with Leonard.  To be sure, *Cement Division I* recognized that district courts could take into account the governmental status of a defendant when setting the rate of prejudgment interest.  But there are reasons to doubt that case's applicability to the instant case. First, the Supreme Court later granted certiorari in *Cement Division I*, and in affirming the Seventh Circuit, noted that the purpose of prejudgment interest is to "ensure that an injured party is fully compensated for its loss," and to compensate the injured party for the "loss of use of money due as damages."  *City of Milwaukee v. Cement Div., Nat'l Gypsum Co.*, 515 U.S. 189, 195–96 (1995). On remand, the district court read this language as foreclosing the use of the governmental defendant's personal interest rate, as using a municipal borrowing rate would "not result in a full compensation for the Plaintiffs," who obviously could not borrow at the same rate.  *Cement Div., Nat'l Gypsum Co.* v. *City of Milwaukee* (*Cement Division II*), 950 F. Supp. 904, 909–10 (E.D. Wis. 1996).  On appeal, the Seventh Circuit found that the district court did not abuse its discretion in adopting this approach.  *Cement Div., Nat'l Gypsum Co. v. City of Milwaukee* (*Cement Div. III*), 144 F.3d 1111, 1114–15 (7th Cir. 1998).  And a few years later, in *First National Bank*, the Seventh Circuit held that to "award something other than the prime rate is an abuse of discretion, unless the district court engages in . . . a refined calculation."  172 F.3d at 480.  Given the Court of Appeals' strong presumption in favor of the prime rate, the court will award prejudgment interest at that rate and adopts Leonard's calculation of the average prime rate from 2013 to 2025 (4.662207%).  (Pl. Br. [159] at 9.)

As shown below, the court has calculated the total current value of Leonard's backpay award, based on an interest rate of 4.662%, compounded monthly, through the date of July 1, 2026.  (*See* Exhibit A.)

| Year | Total Lost Earnings: | Total Current Value |
|------|----------------------|---------------------|
| 2013 | $42,128.69 | $75,367.47 |
| 2014 | $56,539.28 | $96,549.00 |
| 2015 | $51,231.92 | $83,508.30 |
| 2016 | $55,212.68 | $85,905.18 |

14

| 2017 | $47,620.58 | $70,723.98 |
|---|---|---|
| 2018 | $42,435.14 | $60,157.42 |
| 2019 | $43,953.59 | $59,477.05 |
| 2020 | $41,351.44 | $53,411.80 |
| 2021 | $36,065.22 | $44,465.86 |
| 2022 | $44,126.19 | $51,930.93 |
| 2023 | $59,260.73 | $66,571.48 |
| 2024 | $46,220.08 | $49,561.39 |
| 2025 | $14,374.26 | $14,712.61 |

His total award is $812,342.47.

**VIII.    Tax Rebate**

Finally, Plaintiff requests that the court award him a "tax-component" amount to "offset the increased tax burden" that would result from a lump sum judgment.  (Pl. Br. [159] at 11–12.) District courts do have discretion to award additional funds to offset increased taxes,  but in making such an award must "show their work" and explain their calculation of any tax rebate award.  *See E.E.O.C. v. N. Star Hospitality, Inc.*, 777 F.3d 898, 904 (7th Cir. 2015).  Plaintiff has not requested a specific figure, nor has he offered the court a basis from which the court can calculate an award on its own.  Instead, he simply asks for "an amount sufficient to offset any increased income tax liability."  (Pl. Br. [159] at 12.)  In the absence of any basis for making this calculation, the court declines to make such an award at this time.  *Cf. Vega*, 954 F.3d at 1010 (holding that district court abused its discretion in awarding a tax-component award without explaining its calculation).  Plaintiff's request is denied without prejudice to an appropriate motion.

15

## CONCLUSION

Backpay of $812,342.47 will be awarded consistent with the instructions outlined in this opinion. The parties may object to the court's calculations within 14 days, and Plaintiff may renew his motion for a tax-component award. Absent such a motion, the court will enter an appealable final judgment.

ENTER:

Dated: July 27, 2026

REBECCA R. PALLMEYER
United States District Judge

16

## Exhibit A

| Year | Full Standard Pay at GS-11, Step 5 | Prorated Lost Pay | Value of Vacation Time | Projected OT Earnings at 1.5 times hourly rate | Total VA Earnings | Substitute Earnings (Prorated) | Total Lost Earnings: | Total Current Value |
|---|---|---|---|---|---|---|---|---|
| 2013 | $71,296.00 | $58,404.12 | | $3,453.57 | $61,857.69 | $19,729.00 | $42,128.69 | $75,367.47 |
| 2014 | $72,010.00 | $72,010.00 | | $4,258.28 | $76,268.28 | $19,729.00 | $56,539.28 | $96,549.00 |
| 2015 | $72,731.00 | $72,731.00 | | $4,300.92 | $77,031.92 | $25,800.00 | $51,231.92 | $83,508.30 |
| 2016 | $73,657.00 | $73,657.00 | | $4,355.68 | $78,012.68 | $22,800.00 | $55,212.68 | $85,905.18 |
| 2017 | $75,228.00 | $75,228.00 | | $4,448.58 | $79,676.58 | $32,056.00 | $47,620.58 | $70,723.98 |
| 2018 | $76,658.00 | $76,658.00 | | $4,533.14 | $81,191.14 | $38,756.00 | $42,435.14 | $60,157.42 |
| 2019 | $78,086.00 | $78,086.00 | | $4,617.59 | $82,703.59 | $38,750.00 | $43,953.59 | $59,477.05 |
| 2020 | $80,451.00 | $80,451.00 | | $4,757.44 | $85,208.44 | $43,857.00 | $41,351.44 | $53,411.80 |
| 2021 | $81,259.00 | $81,259.00 | | $4,805.22 | $86,064.22 | $49,999.00 | $36,065.22 | $44,465.86 |
| 2022 | $83,423.00 | $83,423.00 | | $4,933.19 | $88,356.19 | $44,230.00 | $44,126.19 | $51,930.93 |
| 2023 | $87,254.00 | $87,254.00 | | $5,159.73 | $92,413.73 | $33,153.00 | $59,260.73 | $66,571.48 |
| 2024 | $91,792.00 | $91,792.00 | | $5,428.08 | $97,220.08 | $51,000.00 | $46,220.08 | $49,561.39 |
| 2025 | $93,674.00 | $6,929.31 | $10,808.54 | $409.41 | $18,147.26 | $3,773.00 | $14,374.26 | $14,712.61 |

17